UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| FAYE ELIZABETH RUDOLPH, )<br>(Social Security No. XXX-XX-9547), )<br>)<br>        Plaintiff, )<br>)<br>        v. )<br>)<br>MICHAEL J. ASTRUE, )<br>COMMISSIONER OF THE SOCIAL )<br>SECURITY ADMINISTRATION, )<br>)<br>        Defendant. ) | 4:10-cv-68-WGH-TWP |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United
States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 7,
9) and an Order of Reference entered by District Judge Tanya Walton Pratt on
September 1, 2010 (Docket No. 12).

## I. Statement of the Case

Plaintiff, Faye Elizabeth Rudolph, seeks judicial review of the final
decision of the agency, which found her not disabled and, therefore, not entitled
to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI")
under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d), 1381; 20
C.F.R. § 404.1520(f). This court has jurisdiction over this action pursuant to 42
U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff applied for DIB and SSI on September 11, 2006, alleging disability
since July 31, 2005. (R. 114-22). The agency denied Plaintiff's application both

initially and on reconsideration.  (R. 44-51, 54-59).  Plaintiff appeared and testified at a hearing before Administrative Law Judge Deborah A. Arnold ("ALJ") on April 15, 2009.  (R. 17-39).  Plaintiff was represented by an attorney; also testifying was a vocational expert.  (R. 17).  On June 2, 2009, the ALJ issued her opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform her past work.  (R. 9-16).  After Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 1-3).  20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on July 2, 2010, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 37 years old at the time of the ALJ's decision and had attended some college.  (R. 174).  Her past relevant work experience included work as an administrative assistant (sedentary, skilled), tax preparer (sedentary, semi-skilled), receptionist (sedentary, semi-skilled), and cashier II (light, unskilled).  (R. 34).

### B.  Medical Evidence

#### 1.  Plaintiff's Impairments

On January 13, 2006, Plaintiff visited the Dunn Memorial Hospital emergency room after she allegedly fell down her basement stairs; she complained that her whole back hurt and she had left arm pain, left wrist pain,

and foot pain. (R. 320-21). Plaintiff underwent X-rays of her back, wrist, shoulder, and foot which were all unremarkable and did not reveal any abnormalities. (R. 327-28).

On April 16, 2006, Plaintiff went to the Dunn Memorial Hospital emergency room with complaints of lower back pain shooting down into her legs. (R. 314-15). Plaintiff had a full range of motion, negative straight leg test, and normal reflexes and sensation. (R. 315).

On July 7, 2006, Plaintiff presented at the Dunn Memorial Hospital emergency room with complaints of congestion and cough that had lasted one and a half weeks. (R. 303). An X-ray revealed bilateral coalescent reticulonodular infiltrates within both lungs, more pronounced in the upper lobes. (R. 311).

On July 11, 2006, Plaintiff underwent a CT scan of her chest, which revealed that her central airways were not obstructed, but that she had patchy multifocal interstitial infiltrate in the upper lobes of both lungs. (R. 280).

On July 26, 2006, Plaintiff presented to Karen Wolf, M.D., a pulmonologist, for evaluation of her complaints of chest pain and cough. (R. 348-51). Dr. Wolf noted that Plaintiff had generally been healthy, but had recently developed a persistent cough with accompanying chest pain. (R. 348). Plaintiff's symptoms were complicated by continued smoking; Dr. Wolf noted that Plaintiff had a remarkable smoking history in that she started smoking at age 9, smoked as much as one and a half packs of cigarettes per day, and was

still smoking. (R. 348-49). Upon physical examination, Dr. Wolf reported that Plaintiff's lungs were clear to auscultation and percussion with good air movement. (R. 350). The only wheezing heard was over her vocal cords on forced expiration. (R. 350). Pulmonary lung function tests revealed a FEV1 of 2.11 liters and a FVC of 2.64. (R. 350). Dr. Wolf noted that a bronchoscopy had not revealed any endobronchial lesions and had indicated that her vocal cords were within normal limits. (R. 350). Based on her examination and review of the diagnostic evidence, Dr. Wolf diagnosed Plaintiff with upper lobe infiltrates, tobacco abuse, possible asthma, heartburn, and morbid obesity. (R. 350-51). Dr. Wolf reported that Plaintiff appeared to be seeking narcotic pain medication; however, Dr. Wolf refused to prescribe such medication, noting that the two primary causes for Plaintiff's cough were continued smoking and continued, uncontrolled gastroesophageal reflux. (R. 351). Dr. Wolf advised Plaintiff that she needed to stop smoking completely and purchase Pepcid AC to treat her gastroesophageal reflux. (R. 351).

On August 7, 2006, Plaintiff underwent a lung biopsy performed by Dr. Karen Rieger. (R. 254-60). Plaintiff was hospitalized until August 16. (R. 256). The exam revealed some evidence of early emphysema and respiratory bronchiolitis interstitial lung disease. (R. 258). She was discharged with instructions to use one to two liters of oxygen per minute at rest or three liters of oxygen per minute with activity; she was to follow up with Dr. Wolf on August 20. (R. 256). A notation from Dr. Wolf on August 21, 2006, explained that this

diagnosis was "great news for Mrs. Rudolph" because she "may not need steroids if she continues to not smoke." (R. 343).

Plaintiff applied for Medicaid on August 21, 2006. (R. 505-635). As part of that application process, Dr. Wolf completed a Medicaid Diagnosis Certification form on August 31, 2006, which indicated that Plaintiff had been diagnosed with emphysema and respiratory bronchiolitis and noted that Plaintiff's prognosis after treatment was excellent. (R. 513-14). Dr. Wolf also composed a letter. (R. 515). Dr. Wolf indicated that she would leave it to Dr. Rieger to decide when she feels that Plaintiff could return to full-time employment (i.e., what recovery time is still needed from the lung biopsy she underwent in August). (R. 515). Dr. Wolf stated that, in her opinion, she believed that Plaintiff was disabled from early July 2006 though the end of August 2006. (R. 515).

On August 31, 2006, Plaintiff visited the emergency room with complaints that her toes were purple. (R. 266-279). She was diagnosed with peripheral cyanosis. (R. 273).

On September 5, 2006, Plaintiff underwent a chest X-ray that was compared to the chest radiograph from August when Plaintiff underwent her lung biopsy. (R. 293). It was noted that there was "moderate interval improvement in diffuse bilateral coalescent interstitial opacities seen throughout both lungs." The X-ray also indicated the possible presence of a small right plural effusion. (R. 293).

On October 29, 2006, Plaintiff underwent a polysomnogram study, which indicated that Plaintiff had severe obstructive sleep apnea and hypoxemia. (R. 395-96). Bianca J. Lang, M.D., reported that no significant periodic limb movements or parasomnies were identified. (R. 396). Dr. Lang indicated that Plaintiff significantly overestimated her sleep latency and underestimated the length of her total sleep time. (R. 395-96). Dr. Lang suggested that Plaintiff may benefit from the application of CPAP therapy. (R. 396). Dr. Lang stated that Plaintiff should be cautioned against driving, operating heavy machinery, or other activities requiring constant attention until Plaintiff's sleep apnea had been adequately treated and her symptoms resolved. (R. 396). Dr. Lang also stated that a weight loss regimen would likely be of benefit to Plaintiff's condition. (R. 396).

On October 30, 2006, a pulmonary function study indicated that Plaintiff's FVC was 2.87 liters, or 78% of the predicted value, and her FEV1 was 2.24 liters, or 74% of the predicted value. Plaintiff was still smoking one-fourth a pack of cigarettes a day. (R. 367-68).

On November 13, 2006, Plaintiff underwent a chest CT scan which revealed a slightly increased size of right axillary lymph node with stable to decreased size of scattered lymph nodes. (R. 394). Also, on November 13, 2006, Plaintiff presented to Dr. Wolf for a follow-up evaluation of her respiratory bronchiolitis. (R. 397-99). Plaintiff had previously been treated with steroids and was advised to quit smoking. (R. 397). Dr. Wolf noted that Plaintiff had a

generally positive review of systems. (R. 397). Upon physical examination, Dr. Wolf noted that Plaintiff's lungs were clear to auscultation and percussion including forced expiration. (R. 398). Plaintiff was currently using oxygen as needed with three liters nightly. (R. 397). At Plaintiff's prior examination, Dr. Wolf had advised Plaintiff that she could safely discontinue using oxygen and had told Plaintiff to follow-up with her treating physician to be sure; however, Plaintiff had failed to keep that appointment. (R. 397). During the appointment, Plaintiff initially claimed that she had stopped smoking entirely, but later admitted that she had been smoking as recently as that morning after Dr. Wolf requested a urine sample. (R. 398). Dr. Wolf stated that, given Plaintiff's dishonesty about smoking, she did not feel safe prescribing smoking cessation products because she feared that Plaintiff would smoke and use the replacement products simultaneously. (R. 398-99). Dr. Wolf stated that Plaintiff's physical examination and chest CT scan did not show significant airway obstruction or emphysema, and that pulmonary function tests were more consistent with the restriction one would see with obesity. (R. 399). Dr. Wolf opined that, although Plaintiff was unable to work from July 2006 through the end of October 2006, Plaintiff was no longer disabled as of the end of October, at least from a pulmonary perspective. (R. 398). Dr. Wolf opined that Plaintiff was not disabled from any lung disease as of November 2006. (R. 399).

On November 17, 2006, Mehmet Akaydin, M.D., conducted a consultative physical examination. (R. 380-86). Plaintiff stated that the main reasons that

she applied for disability were because of her weight and her nerves, but that she also had some problems with her lungs as well. (R. 380). Plaintiff stated that her lung problems were generally doing much better, but that she still had significant shortness of breath with any type of excessive physical exertion, which she attributed to her obesity. (R. 380). She also alleged that she had some problems with ongoing discomfort in her lower back, which she attributed to her obesity and an injury suffered in a motor vehicle accident in 1994. (R. 380). Plaintiff still reported smoking one-half a pack of cigarettes a day. (R. 381). When Dr. Akaydin asked Plaintiff about her subjective symptoms, Plaintiff stated, "to tell you the truth I really feel pretty good all things considered. I'm just a little tired right now, but I'm tired pretty much all the time anymore." (R. 381). Plaintiff denied having any current or recent chest pain. (R. 381). She also denied having any severe musculoskeletal discomfort of any kind. (R. 381). Plaintiff reported that she did have shortness of breath with any type of physical exertion, stating "I guess I'm just too fat and out-of-shape for my own good." (R. 381). Dr. Akaydin noted that Plaintiff was alert and oriented, in no acute distress, and appeared to be generally quite healthy and vigorous. (R. 381). Dr. Akaydin noted that Plaintiff had a very bright affect; that she was extremely amiable, personable, and jovial at all times; and that she had a very bright and engaging smile. (R. 381). Upon physical examination, he reported that Plaintiff's lungs were clear to auscultation without any overt wheezing, rales, or rhonchi appreciated. (R. 382). Dr. Akaydin noted that Plaintiff's arms and legs were

extremely healthy in overall appearance and that Plaintiff was extremely limber considering her body habitus/obesity. (R. 382). Plaintiff had essentially full range of motion in all joints, normal muscle tone and bulk throughout, fully normal muscle strength, and intact sensation. (R. 382-83). Dr. Akaydin noted that Plaintiff's station and gait were totally normal with excellent overall speed and stability. (R. 383). Plaintiff was able to tandem, toe and heel walk extremely well with excellent overall balance and coordination skills and could squat fully and raise back up under her own power without any problems whatsoever. (R. 383). Based on his examination, Dr. Akaydin concluded that, aside from her severe obesity, Plaintiff appeared to be essentially fully intact in a gross general cognitive, physical, neurological, and orthopedic sense without any major limiting deficits of any kind. (R. 384). Dr. Akaydin opined that Plaintiff should be quite capable of performing most forms of at least mildly physically strenuous work without any difficulty whatsoever, especially those jobs that are basically of a relatively sedentary and "sit-down" type nature where she could put her fully intact cognitive/intellectual skills to effective use while at the same time placing minimal physical stress/strain on her body as a whole. (R. 384). He opined that vocational rehabilitation would be an excellent opportunity to acquire the training and skills necessary to re-enter the workforce. (R. 384). Dr. Akaydin opined that Plaintiff should probably avoid any type of employment requiring frequent repetitive heavy lifting or prolonged standing/walking, but stated that she would have no difficulty whatsoever performing relatively sedentary work

that involved a moderate amount of standing, walking, and stair climbing.  (R. 385).  He strongly recommended Plaintiff start a weight-loss program.  (R. 385).

On November 27, 2006, Plaintiff underwent another polysomnogram sleep study with the use of a CPAP machine, which indicated that her obstructive sleep apnea would benefit from the use of a CPAP machine.  (R. 402-03).  The study indicated that Plaintiff's oxygen saturations were well-maintained above 90% with use of the CPAP machine.  (R. 402).  Dr. Lang again noted that Plaintiff markedly overestimated her sleep onset latency by one hour and markedly underestimated her total sleep time at 3 hours.  (R. 402).  Although she opined that Plaintiff should be cautioned against driving, operating heavy machinery, or performing other activities that required constant attention, Dr. Lang stated that these limitations need only remain in effect until Plaintiff was adequately treated.  (R. 403).  Dr. Lang recommended that Plaintiff initiate CPAP therapy at that time, and opined that Plaintiff should begin a weight-loss program.  (R. 403).

On December 13, 2006, it was noted that Plaintiff was obtaining a free CPAP machine and a gel mask at a reduced price.  (R. 416).  Plaintiff was using a CPAP machine on December 16.  (R. 428).

On December 16, 2006, Plaintiff underwent a consultative psychological evaluation performed by Christopher A. Catt, Psy.D.  (R. 427-31).  Plaintiff reported that her chief complaints were lung disease, back problems, and multiple medical complaints.  (R. 427).  She told Dr. Catt that Dr. Wolf wanted her to be off work and told her to apply for disability.  (R. 427).  Plaintiff denied

ever having undergone any type of inpatient or outpatient mental health treatment. (R. 428). Plaintiff stated that she resided with her husband and had a 10-year old child within the home. (R. 427). She reported that her activities of daily living included bathing, brushing her teeth, managing her bills, going shopping twice a month, watching television and movies, listening to music, going to church, using a computer, caring for her dogs, driving a car, talking on the phone, visiting with her parents, and interacting with her family, in-laws, friends, and neighbors, and caring for her 10-year old. (R. 428-29). Dr. Catt's mental status examination was unremarkable, as Plaintiff was able to complete all mental tasks without any noted difficulties. (R. 429-30). Dr. Catt noted that Plaintiff's attention and concentration were normal, her intellectual functioning was average, her judgment was good, and her social skills were adequate. (R. 429-31). Dr. Catt diagnosed Plaintiff with adjustment disorder with anxious-depressed mood and assessed a GAF score of 50 to 55. (R. 431). Dr. Catt referred Plaintiff to the Southern Hills Counseling Agency for treatment of anxiety and depression and opined that her prognosis was fair. (R. 431).

Treatment notes from William Blaisdell, M.D., Plaintiff's treating physician, do not reflect that Plaintiff subsequently complained of having any significant fatigue symptoms during the course of his treatment from 2007 through 2008. (R. 459-62).

On August 3, 2007, an X-ray of Plaintiff's esophagus was essentially negative with primarily normal findings, including no gastroesophageal reflux. (R. 463).

A biopsy of Plaintiff's esophagus/stomach performed July 31, 2007, revealed mild chronic esophagitis. (R. 464). A September 7, 2007, gastric-emptying study revealed that Plaintiff's stomach emptied promptly and that there was no evidence of delayed stomach emptying that would account for her gastroesophageal reflux symptoms. (R. 475).

On January 7, 2008, testing revealed left lower lobe pneumonia. (R. 479). Spirometry testing on January 10, 2008, indicated that Plaintiff had a FVC of 2.68 liters, which was 73% of predicted value and mildly reduced, and a FEV of 2.15 liters, which was 74% of the predicted value and moderately reduced. (R. 482).

Medical records from January 9, 2008, indicate that Plaintiff only allegedly quit smoking on November 6, 2007. (R. 487).

On January 15, 2008, Plaintiff underwent a laparoscopic fundoplication surgery in order to treat her GERD due to concern that her pulmonary symptoms could be exacerbated secondary to gastric reflux. (R. 469-70). Plaintiff tolerated the procedure quite well. (R. 469).

On February 8, 2008, Plaintiff presented for a routine scheduled post-operative follow-up appointment. (R. 467-68). It was noted that Plaintiff's recovery from surgery had been uneventful and that she was doing great at

home.  At that time, Plaintiff reported that she had been using 1 to 2 liters of oxygen as needed.  (R. 467-68).

## 2. State Agency Review

On December 14, 2006, Steven Roush, M.D., a state agency reviewing physician completed a Physical Residual Functional Capacity Assessment.  (R. 417-24).  He opined that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday.  (R. 418).  Plaintiff had no postural limitations.  (R. 419).  Dr. Roush also opined that Plaintiff should avoid concentrated exposure to extreme temperatures, fumes, odors, dusts, gases, and poor ventilation.  (R. 421).  Dr. J. Sands, another state agency reviewing physician, affirmed Dr. Roush's opinion on April 20, 2007.  (R. 450).

On December 28, 2006, F. Kladder, Ph.D., a state agency reviewing psychologist, completed a Psychiatric Review Technique (R. 432-45) and opined that Plaintiff did not have a severe mental impairment.  (R. 432).  He found that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace with no episodes of decompensation.  (R. 442).  Joseph A. Pressner, Ph.D., another state agency reviewing psychologist, affirmed Dr. Kladder's opinion on April 3, 2007.  (R. 446).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV. Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social

Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date and that Plaintiff was insured for DIB through December 31, 2009. (R. 11). The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had two impairments that are classified as severe: early emphysema and obesity. (R. 11). Plaintiff also had three non-severe impairments: GERD; sleep apnea; and anxiety. (R. 12). The ALJ concluded that none of these impairments met or substantially equaled any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13). The ALJ determined that Plaintiff's testimony was not fully credible. (R. 13-15). The ALJ then found that Plaintiff retained the RFC for sedentary work except she can: lift

and carry ten pounds occasionally; stand/walk for two hours in an eight-hour workday; and avoid concentrated exposure to temperature extremes, fumes, odors, and gases. (R. 13). The ALJ determined that, based on this RFC, Plaintiff could perform her past work as a receptionist, tax preparer, and administrative assistant. (R. 16). The ALJ, therefore, concluded that Plaintiff was not under a disability. (R. 16).

## VI. Issues

Plaintiff has raised three issues. The issues are as follows:

1. Whether the ALJ erred by failing to find Plaintiff's GERD, sleep apnea, and anxiety to be severe.

2. Whether the ALJ's credibility determination is patently wrong.

3. Whether the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.

**Issue 1:     Whether the ALJ erred by failing to find Plaintiff's GERD, sleep apnea, and anxiety to be severe.**

Plaintiff's first argument is that the ALJ should have found that her GERD, sleep apnea, and anxiety were severe impairments at step two of the five-step sequential evaluation process. There was nothing improper about the ALJ's decision at step two. As then U.S. District Judge (now Circuit Judge) David Hamilton has indicated, "[a]s long as the ALJ proceeds beyond step two, as in this case, no reversible error could result solely from his failure to label a single impairment as 'severe.' The ALJ's classification of an impairment as 'severe' or

'not severe' is largely irrelevant past step two. What matters is that the ALJ considers the impact of all of the claimant's impairments–'severe' and 'not severe'–on her ability to work." *Gordon v. Astrue,* 2007 WL 4150328 at *7 (S.D. Ind. 2007). In this case, the ALJ proceeded beyond step two and analyzed Plaintiff's GERD, sleep apnea, and anxiety in combination with all of Plaintiff's other impairments. Therefore, his failure to label these impairments as severe was not an error requiring remand.

**Issue 2: Whether the ALJ's credibility determination is patently wrong.**

Plaintiff also argues that the ALJ conducted a flawed analysis of her credibility. An ALJ's credibility determination will not be overturned unless it is "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). However, here the ALJ's "credibility" decision is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain. Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is

-17-

no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added; footnote omitted). SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant, including: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

Here, the ALJ conducted a very thorough credibility determination at R. 13-15. He opined that Plaintiff's activities of daily living, continued smoking, dishonesty, and reports from her medical providers all called into question her credibility. A careful review of the record indicates that the ALJ's credibility determination was not patently wrong.

We note specifically that Plaintiff alleges that she suffers from severe lung problems. However, despite the fact that she was instructed to completely cease smoking in July 2006 (R. 351), she continued to report smoking in October 2006 (R. 367-68) and November 2006 (R. 398), and did not report quitting smoking until November 2007 (R. 487). Furthermore, Plaintiff was caught lying about her

smoking to Dr. Wolf. (R. 398). Additionally, Plaintiff alleged at her hearing that she was on oxygen 24 hours a day since 2004. (R. 22). Yet, the record reveals that Plaintiff was using only three liters of oxygen nightly in November 2006 and was advised that she could discontinue oxygen use. (R. 397). In February 2008, Plaintiff was using one to two liters of oxygen, as needed. (R. 467-68).

Next, Plaintiff testified at her hearing that she was told she only gets 45 minutes of sleep a night. (R. 32). But, sleep specialists have reported that Plaintiff markedly underestimated her amount of sleep, and that she was actually sleeping in excess of six hours. (R. 395-96, 402). Plaintiff was instructed that her excessive weight was a contributing factor to her sleep apnea and told to lose weight (R. 396), yet there is no indication in the medical records that Plaintiff lost any significant amount of weight during the relevant time period.

In addition, Plaintiff told consultative examiner Dr. Catt in December 2006 that Dr. Wolf wanted her off work and that she should apply for disability. (R. 427). However, Dr. Wolf actually reported in November 2006 that Plaintiff was no longer disabled as a result of her lung problems. (R. 398). And, Plaintiff had told Dr. Akaydin in November 2006 that her lung problems were much better. (R. 380).

Along with these discrepancies between Plaintiff's statements and the actual record, the court notes that Plaintiff's activities of daily living support the ALJ's credibility determination. Plaintiff reported to Dr. Catt in December 2006

that her activities of daily living included bathing, brushing her teeth, managing her bills, going shopping twice a month, watching television and movies, listening to music, going to church, using a computer, caring for her dogs, driving a car, talking on the phone, visiting with her parents, and interacting with her family, in-laws, friends, and neighbors, and carry for her 10-year old. (R. 428-29). Such an extensive list of activities reveals an individual who is much less impaired than Plaintiff claims.

In conclusion, Plaintiff's failure to adhere to recommendations from doctors to quit smoking and lose weight, her lack of honesty, her extensive activities of daily living, her misreporting of her condition, and the reports from her treating physician, Dr. Wolf, that she was not disabled from a lung standpoint all reveal that the ALJ's credibility determination was not patently wrong and must be upheld.

**Issue 3:** **Whether the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.**

Finally, Plaintiff finds fault in the ALJ's assessment of her RFC. The Magistrate Judge concludes that the ALJ's determination that Plaintiff could perform a limited range of sedentary work is supported by the record. The ALJ reasonably took Plaintiff's obesity and lung impairment into consideration and limited Plaintiff to only sedentary work with no concentrated exposure to irritants. Contrary to Plaintiff's assertions, there is substantial evidence in the

record that Plaintiff's GERD, sleep apnea, and anxiety did not lead to any more significant limitations. The consultative mental exam performed by Dr. Catt revealed mild mental limitations, and state agency reviewers opined that Plaintiff did not have a severe mental impairment. (R. 432-46). As for Plaintiff's sleep apnea, the evidence reveals that in November 2006 a sleep study with the use of a CPAP machine revealed that CPAP therapy would improve Plaintiff's sleep apnea, and Plaintiff did, in fact, begin using a CPAP machine. (R. 403, 428). There is no medical evidence in the record that indicates that Plaintiff continued to be treated for fatigue or any other impairment resulting from sleep apnea after December 2006. Finally, concerning Plaintiff's GERD, the record reveals that Plaintiff was prescribed only over-the-counter medication, and testing in August and September 2007 revealed X-rays that were essentially normal and a normal stomach emptying study. (R. 463, 475). While Plaintiff did ultimately undergo surgery to correct her GERD in January 2008, there is no objective medical evidence in the record that indicates that her GERD continued to be a problem or that it limited Plaintiff in any way. Based on the totality of the medical records, the ALJ's RFC determination is supported by substantial evidence and is affirmed.

## VII. Conclusion

The ALJ did not err by finding that Plaintiff's GERD, sleep apnea, and anxiety were not severe impairments. The ALJ's credibility determination

was not patently wrong. Finally, the ALJ's RFC findings are supported by substantial evidence. The decision of the Commissioner of the Social Security Administration is **AFFIRMED**.

     **SO ORDERED** the 16th day of March, 2011.

_____
William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Steven K. Robison
MONTGOMERY ELSNER & PARDIECK
srobison@meplegal.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov